# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched or identify the person by name and address)* )<br> )<br>1422 North Sweetzer Avenue, Apartment 306, West )<br>Hollywood, California )<br> )<br> ) | Case No. 2:18-mj-3256 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession with intent to distribute and distribution of controlled substances |
| 21 U.S.C. § 841 | Conspiracy and attempt to distribute controlled substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

William B. Petty, Special Agent, Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, CA                Paul Abrams, United States Magistrate Judge
*Printed name and title*

AUSA: Robert White ((313) 226-9620); Sara Milstein (x8611)

**ATTACHMENT A**

PREMISES TO BE SEARCHED

The residence located at 1422 North Sweetzer Avenue, Apartment 306, West Hollywood, CA 90069 (the "SUBJECT PREMISES"). The SUBJECT PREMISES is located inside a gated apartment complex named Sunset Lanai Apartments. Building 1422 is a three story residential apartment building constructed from concrete block and the exterior is white-colored stucco with a grey roof. On the wall of the building, there are three dark colored circles with white letters reads "sunset Lanai 1422". Parking spaces for residents are located underneath the building. Access to the lobby is secured by a locked dark colored metal fence where guests are buzzed in by the resident via a call box.

The SUBJECT PREMISES to be searched includes: (a) all rooms, porches, containers, and safes in the SUBJECT PREMISES and vehicles associated with the SUBJECT PREMISES; (b) the driveway, and any detached or attached garages, carports, vehicles, storage spaces, or other outbuildings on the SUBJECT PREMISES; (c) any digital devices inside the SUBJECT PREMISES.







**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841 (possession with intent to distribute and distribution of controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

i

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

f.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

g.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook,

Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

i.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

j.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

k.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

l.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital devices on-site or seize and transport the devices and/or forensic images thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital devices and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   6.   During the execution of this search warrant, law enforcement is permitted to: (1) depress YASS's thumb- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in

front of YASS's face with his or her eyes open to activate the
facial-, iris-, or retina-recognition feature, in order to gain
access to the contents of any such device.  In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

    7.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## AFFIDAVIT

I, William Petty, being duly sworn, declare and state as
follows:

### I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application
for a warrant to search 1422 North Sweetzer Avenue, Apartment
306, West Hollywood, California (the "SUBJECT PREMISES"), as
described more fully in Attachment A.

2.   The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of
21 U.S.C. §§ 841 (possession with intent to distribute and
distribution of controlled substances) and 846 (conspiracy and
attempt to distribute controlled substances) (the "Subject
Offenses"), as described more fully in Attachment B.
Attachments A and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrant,
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

### II. BACKGROUND OF SPECIAL AGENT WILLIAM PETTY

4.   I am a Special Agent with the United States Department
of Homeland Security - Homeland Security Investigations ("HSI"),

and have been so employed since 2010.  I have received training in identifying various controlled substances and conducting narcotics and illegal drug investigations. I have been involved in numerous dangerous-drug cases involving undercover buys, arrests, and execution of search warrants.  I have spoken and worked with other law enforcement agents with extensive experience in illegal drug investigations.  I have made numerous arrests for violations of Title 21 of the United States Code, and am familiar with the identification of many types of controlled substances by sight and color, including marijuana, cocaine, and methamphetamines.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.   Using the address of the SUBJECT PREMISES, YASS sold a total of approximately 630 grams of methamphetamine in three transactions involving packages sent by mail to someone he thought was a drug customer, but who was actually an undercover HSI agent (the "UC").  The packing slips for the packages containing methamphetamine show that the packages were sent from YASS at the SUBJECT PREMISES. YASS also directed the UC to pay for the methamphetamine in money orders sent to the SUBJECT PREMISES.  Additionally, as recently as December 6, 2018, YASS arranged via phone calls and text messages to sell approximately 2 pounds of methamphetamine to the UC, at a meeting location to be determined in the vicinity of Long Beach, California.  A United States Magistrate Judge in the Eastern District of Michigan issued a complaint and arrest warrant for violations of Title 21, United States Code, Sections 841 and 846.

6.    Law enforcement believes YASS continues to reside at the SUBJECT PREMISES because, among other things, of YASS's use of the address of the SUBJECT PREMISES requested payment be sent to him at the SUBJECT PREMISES, and because surveillance agents saw the car registered to YASS parked at the SUBJECT PREMISES on multiple occasions.

## IV. STATEMENT OF PROBABLE CAUSE

7.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.    The CS Identifies YASS as His/Her Source of Methamphetamine Supply

8.    The CS told law enforcement that a person named "Warren" was a methamphetamine trafficker.[1]  The CS said that the CS had purchased narcotics from "Warren" at least ten times, with "Warren" shipping the purchased narcotics via the United States Postal Service ("USPS").  The CS possessed a United States priority express mail receipt addressed to "Warren Yass" at the SUBJECT PREMISES.  Subsequently, USPS placed an alert on the SUBJECT PREMISES.

9.    Law enforcement identified a package being shipped from a nonexistent address in West Hollywood, California, to an address in Pontiac, Michigan ("Package 1").

a.    USPS intercepted Package 1, and on or about March 7, 2018, the Honorable R. Steven Whalen, United States

---

[1] The information the CS has given to law enforcement officers has thus far proved to be truthful and reliable.  The CS has a prior felony conviction for possession of methamphetamine.

Magistrate Judge for the Eastern District of Michigan, issued a warrant to search Package 1.  Package 1 contained approximately 240 grams of a crystalline substance that tested positive for properties of methamphetamine.  Based on my training and experience, and from my conversations with other law enforcement officers, this quantity of methamphetamine is consistent with distribution.

b.    I know from other investigators on this case that law enforcement searched USPS databases and found out that Package 1 was sent from a USPS post office in West Hollywood, California on or about March 5, 2018.

10.  Agents reviewed Post Office security camera footage from the Hollywood, California USPS post office from on or about March 5, 2018, and saw an individual agents believe to be YASS mailing three packages that were similar in size, color, and shape to the Package 1.  Agents reviewing the Post Office security video recognized YASS because they had previous reviewed YASS's photograph from YASS's Facebook profile.  Law enforcement also showed YASS's driver's license photograph to the CS, and the CS positively identified the photo as the individual as "Warren."

11.  On or about March 7, 2018, I know that USPS inspectors learned that Package 1 was tracked online using from two Internet Protocol ("IP") address.  Using administrative subpoenas, HSI agents learned that one of the IP addresses was registered to the CS in Michigan, and the other IP address was registered to YASS at the SUBJECT PREMISES.

**B.   YASS Sells Methamphetamine to an Undercover HSI Agent**

12.   On or about July 9, 2018, YASS began coordinating drug shipments with someone YASS thought was a drug customer, but who was, in fact, an undercover HSI agent (the "UC").

13.   YASS and the UC communicated by telephone in recorded phone calls and by text message.  I have reviewed the recorded calls and text messages.[2]

14.   On or about July 13, 2018, the UC called YASS at (323) 638-4894 (the "4894 Number"), the number the CS said belonged to YASS.

a.   Agents searched the 4894 Number in a commercial database and learned that the 4894 Number is registered to YASS at the SUBJECT PREMISES.

15.   In the July 13, 2018 text messages, YASS agreed to ship the UC a package containing approximately 2 ounces of methamphetamine in exchange for $1,000.  On or about July 18, 2018 the UC received a package containing approximately 2 ounces of methamphetamine.  The sender of the package is listed as "Walter Smith," and the package is listed as coming from the SUBJECT PREMISES.

16.   Subsequently, the UC and YASS exchanged multiple text messages to coordinate the shipment of the methamphetamine and the transfer of payment between YASS in California and the UC in Detroit.

_____

[2] Based on the communication between YASS and the UC and on my conversations with the UC, I identified the voices on these recordings as belonging to the UC and to YASS.

17.  On or about July 13, 2018, the UC received the
following text message from YASS using the 4894 Number: "Warren
Yass 1422 N Sweetzer Ave Apt 306 West Hollywood, CA 90069."
This address is the SUBJECT PREMISES.

18.  On or about July 16, 2018, the UC purchased a USPS
money order for $1,000 and mailed it USPS Priority Mail
Express/Next Day to YASS at the SUBJECT PREMISES.

19.  On or about July 16, 2018, the UC sent a text message
to YASS on the 4894 Number with an image of the USPS shipping
receipt/tracking number to YASS.  Shortly after, the UC sent a
text message to YASS with the UC's shipping address in Detroit,
Michigan.

20.  On or about July 17, 2018, the UC received the
following text message from YASS on the 4894 Number: "Hey [UC] –
sorry I didn't send it out yesterday – I'll throw in an extra
ball on the house.  But I have some options for you – I'm
getting a new batch today, I just likely won't have it in time
to get it out for delivery tomorrow. I can wait, or I can throw
together a mix bag of a few different batches that I have on
hand – what would you prefer?"

        a.   In my training and experience, and from speaking
with other law enforcement officers, I believe that the term
"ball" refers to 3.5 grams of a narcotic.

21.  On or about July 17, 2018, the UC replied the
following: "Hi Warren. I'll take the mixed bag for now. Can you
send it out today?"

6

22.   On or about July 17, 2018, the UC received the
following text message from YASS on the 4894 Number: "How much
money did you send"

23.   On or about July 17, 2018, the UC replied the
following to the 4894 Number: "$1000"

24.   On or about July 17, 2018, the UC received a text
message from YASS containing an image of a shipping receipt with
a USPS tracking number EM032644792US (the "Tracking Number").
YASS also sent the following text message: "And I was able to
get you 2o + 1b same batch."

      a.   In my training and experience, and from speaking
with other law enforcement officers, I believe that the terms
"2o" and "1b" refer to 2 ounces and 1 ball (or 3.5 grams).

25.   On or about July 18, 2018, the UC received a USPS
delivery notice referencing the Tracking Number, went to a USPS
post office, and was given a USPS Priority Mail Express envelope
displaying the Tracking Number.

26.   The package bearing the Tracking Number contained a
crystalline substance.  Oakland County Sheriff crime laboratory
analyzed the substance contained inside the package sent from
YASS to the UC and determined that the substance was
approximately 59.89 grams of methamphetamine.

      a.   In my training and experience, I believe that
this quantity of methamphetamine is consistent with
distribution.

27.   On or about July 18, 2018, the UC received the
following text message from YASS on the 4894 Number: "All good?"

28.   On or about July 18, 2018, the UC replied the
following to the 4894 Number: "All good."

29.   The UC conducted two additional drug purchases from
YASS by communicating with YASS by phone and text message on the
4894 Number.

     a.   On or about July 30, 2018, the UC received a
mailing from YASS that contained suspected methamphetamine, for
which the UC had paid to YASS $1,750 by money order.  The
Oakland County Sheriff Crime Laboratory later analyzed the
suspected methamphetamine and determined that it was
approximately 115.89 grams of methamphetamine.

     b.   On or about August 21, 2018, the UC received a
mailing from YASS that contained suspected methamphetamine, for
which the UC had paid to YASS $5,000 by money order.  The
Oakland County Sheriff Crime Laboratory later analyzed the
suspected methamphetamine and determined that it was
approximately 389.09 grams of methamphetamine.

30.   To date, YASS has shipped to the UC a total of
approximately 630 grams of methamphetamine in three packages
listing fictitious return addresses.

**C.   USPS Intercepts an Additional Drug Package Sent to the
       SUBJECT PREMISES**

31.   In or about November 2018, a Postal Inspector
intercepted a package that was sent on or about November 1,
2018, from New Jersey to the SUBJECT PREMISES.  A federal
warrant was issued to search the package after a narcotic canine
alerted to the presence of drugs or drug residue on or inside

8

the package.  The package was opened and contained what was
later tested and confirmed to be approximately 12 grams of MDMA,
a controlled substance analogue.

### D.   Complaint and Arrest Warrant Issued for YASS

32.   On or about December 7, 2018, United States Magistrate
Judge Mona K. Majzoub, of the Eastern District of Michigan,
issued a complaint and arrest warrant against YASS for
violations of 21 U.S.C. §§ 846 and 841.

### E.   YASS Offers to Sell Two Pounds of Methamphetamine to the UC

33.   In calls and text messages on or about December 6,
2018, YASS, using the 4894 Number, coordinated the sale of two
pounds of methamphetamine with the UC.  Specifically, the UC
said that a truck driver working with the UC would be traveling
to California and driving back to Michigan.  In response, YASS
stated they were "going to work something out for sure."  YASS
also told the UC that the price for a pound is "5000," but
because the UC was ordering two pounds, YASS would give the UC a
price "break," and would charge him "9500 maybe."

### F.   Investigation of the SUBJECT PREMISES

34.   Based on a search of records from the California
Department of Motor Vehicles ("DMV"), I know that YASS reported
the SUBJECT PREMISES as his residence.

35.   From DMV records, I also learned that a blue 2013
Volvo with California license number 6YSG692 (the "Volvo") is
registered to YASS at the SUBJECT PREMISES.

36. On or about December 7, 2018, I know from HSI surveillance agents that the Volvo was parked in the underground parking structure beneath the building that houses the SUBJECT PREMISES.

37. As detailed above, an IP address registered to YASS at the SUBJECT PREMISES was tracking a package that was confirmed to contain drugs.

38. As noted above, the 4894 Number that YASS has repeatedly used to communicate with the UC is subscribed to YASS at the SUBJECT PREMISES.

39. Also as noted above, in conversations between YASS and the UC, with YASS using the 4894 Number, YASS requested that payment for drugs be sent to the SUBJECT PREMISES.

## V.  **TRAINING AND EXPERIENCE ON DRUG OFFENSES**

40. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel in connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers, including those who distribute drugs through the mail, often maintain books, receipts, notes, ledgers, bank records, and other records relating to the

manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

11

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

41.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.

13

Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

   c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

   d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[3] Electronic files saved to a hard drive can be stored for years

---

  [3] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

        e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital

devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a

controlled laboratory environment, and also can require
substantial time.

f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

g.    Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a

process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

42.  As discussed herein, based on my training and experience I believe that digital devices will be found during the search and I believe that one or more of these digital devices will be enabled with biometric unlock functionality.

a.   I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c.   If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on

19

the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement).  Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).  Apple calls its facial-recognition unlock feature "Face ID."  The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

     d.   While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data.  The human iris, like a fingerprint, contains complex patterns that are unique and stable.  Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light.  Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels.  A user can register one or both eyes to be used to unlock a device with these features.  To activate the feature, the user holds the device in front of his

20

or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes.  The device is then unlocked if the camera detects the registered eye.  Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

43.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

44.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include

21

when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

45. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

46. For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to: (1) compel the use of YASS's thumb- and/or fingerprints on the devices; and (2) hold the devices in front of YASS's face with his eyes open to activate the facial-, iris-, and/or

retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

47.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

48.  For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A.

 

 

_____
William Petty, Special Agent
Department of Homeland
Security

Subscribed to and sworn before me
this ____ day of December, 2018.

_____
UNITED STATES MAGISTRATE JUDGE